887 F.2d 1088
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
John SLICKER (88-1767) and Stanislaus Grabski (88-1805),
Defendants-Appellants.
 Nos. 88-1767, 88-1805.
 United States Court of Appeals, Sixth Circuit.
 Oct. 23, 1989.
 
 Before DAVID A. NELSON and RYAN, Circuit Judges, and RONALD E. MEREDITH, District Judge.*
 PER CURIAM.
 
 
 1
 Appellants John Slicker and Stanislaus Grabski were convicted of multiple counts of mail fraud in violation of 18 U.S.C. Secs. 1341 and 1342. Mr. Slicker questions the sufficiency of the evidence that was presented to show that he used the mails. He also argues that the district court committed plain error by failing to instruct the jury that to convict on any count, the jury would have to find that Mr. Slicker mailed the specific item named in that count. Mr. Grabski argues that the district court erroneously permitted the government to rehabilitate its witnesses through hearsay and third-party testimony as to prior consistent statements. He argues further that the government's closing argument improperly invited the jury to draw an adverse inference from the defendants' failure to call certain witnesses. Finding appellants' arguments unpersuasive, we shall affirm the convictions.
 
 
 2
 * Messrs. Slicker and Grabski were principals of Superior Real Estate Company, an entity through which they sold houses they owned personally. Most of Superior's customers were unemployed or were otherwise bad credit risks. When prospective buyers filled out mortgage applications, the defendants (or others acting at their direction) would have them give false information regarding their employment and income. Employment verification forms designed to be filled out by employers would be completed by the buyers themselves, and the defendants then had the fraudulent forms sent to a mortgage company called Lambrecht Realty. It was made to appear that the forms came from the buyers' supposed employers, and not from the buyers themselves. Lambrecht approved mortgages for ten buyers in reliance on false employment and income data contained in such forms.
 
 
 3
 Each defendant was charged with a separate count of mail fraud in connection with each of the ten mortgage applications. A jury found both defendants guilty on all counts, and these appeals followed.
 
 II
 
 4
 * Mr. Slicker argues first there was insufficient evidence to show he used the mails. The argument is unavailing.
 
 
 5
 Donald Houghtalin, Lambrecht's service manager, testified at trial that his company "required" that employers send in the verification forms by mail. Buyers could not bring in the documents personally, he testified, because they might alter the information on the forms.
 
 
 6
 Sherry Hall Meloff, the secretary and office manager for Superior Real Estate, testified that after a buyer falsified his form at defendants' direction, "somebody at Superior Real Estate would take the letter that was completed correctly to a mail box near the place of employment and mail that letter back to the mortgage company so that it appeared as if the employer filled it out."
 
 
 7
 Asked why the letter was not carried by hand, Ms. Meloff answered, "The mortgage company would not accept it." Even assuming Ms. Meloff had no basis in fact for asserting that Lambrecht would accept only verification forms that had been mailed, her testimony demonstrates what Superior understood Lambrecht's policy to be; the testimony supports the conclusion that the defendants always used the mails.
 
 
 8
 James Canty, a salesman for Superior, also testified that the forms would always be mailed to Lambrecht from the area where the bogus employment supposedly existed. It was important to the scheme that it be done this way, he told the jury, explaining that a form ostensibly coming from an employer in Grand Rapids would arouse suspicion if it were postmarked in Detroit.
 
 
 9
 James Brooks, another salesman for Superior, testified on direct examination that he "would take the employment verification [form], drive over to the area where it's supposed to be mailed, and mail it from that area." On cross-examination, however, Mr. Brooks testified that he sometimes took documents to Lambrecht himself. On redirect, the following exchange took place:
 
 
 10
 "Q. Now as to the employment verification forms--strike that. You took some forms directly to Lambrecht; is that correct?
 
 
 11
 A. Yes, I did.
 
 
 12
 Q. And you mailed others?
 
 
 13
 A. Yes, we did.
 
 
 14
 Q. Which ones did you mail?
 
 
 15
 A. We--I can't really saym [sic] I don't remember that.
 
 
 16
 Q. Not specifically you mailed any type of forms. In other words, employment verification forms, were those [mailed] to Lambrecht?
 
 
 17
 A. Yes, they were."
 
 
 18
 In United States v. Stull, 521 F.2d 687, 690 (6th Cir.1975), cert. denied, 423 U.S. 1059 (1976), this court reversed certain mail fraud convictions because some of the critical documents had been delivered personally and there was no way to tell which had been mailed. In the present case, we must decide whether Mr. Brooks' testimony left the jury with no rational basis for concluding that the fraudulent forms were mailed in each instance.
 
 
 19
 Viewing the evidence as a whole, we think the jury had ample grounds for concluding that the forms were invariably mailed. The testimony of the three witnesses other than Mr. Brooks supports that conclusion, and the testimony shows, first, the importance of mailing the bogus verification forms in the vicinity of the claimed employment, and second, the regular practices and policies of Superior (through Mr. Canty and Ms. Meloff) and Lambrecht (through Mr. Houghtalin) regarding the mailing and receipt of verification forms. Cf. United States v. Sumnicht, 823 F.2d 13 (2d Cir.1987) (testimony that mail was used "normally" and "ordinarily" held sufficient to show use of mails, where delivery by hand might have aroused suspicion). The testimony of Mr. Brooks was ambiguous, if not self-contradictory, and the jury was entitled to conclude that if Brooks intended to say that he took verification forms directly to Lambrecht, he was mistaken.
 
 B
 
 20
 Appellant Slicker argues next that the jury was permitted to find guilt based on any mailing he may have made, without regard to whether he made the mailings charged in the indictment. In this connection Mr. Slicker says that the district court erred in failing to instruct the jury that before it could return a verdict of guilty, it would have to find beyond a reasonable doubt that Slicker caused the mailings specifically charged in each of the ten counts. No request for such an instruction was made, and there was no contemporaneous objection to the charge as given, so the question is whether the district judge committed plain error by not giving the instruction sua sponte. United States v. Griffin, 382 F.2d 823, 828 (6th Cir.1967).
 
 
 21
 The judge read the indictment to the jury as part of the jury instructions. The indictment specifically charged the mailing of each of the ten verification forms. The judge also read the mail fraud statutes to the jury, and told the jury that "it is enough that the evidence in the case establishes beyond a reasonable doubt that an accused knowingly caused to be delivered by mail according to the direction thereon, any matter or thing as charged in the indictment."
 
 
 22
 We think that these instructions adequately covered the point now pressed by Mr. Slicker.
 
 C
 
 23
 Appellant Grabski complains that the district court erred in permitting the government to rehabilitate impeached witnesses, over objection, through a third party's testimony as to prior consistent statements.
 
 
 24
 The government called Postal Inspector James Black to verify certain documents. The defendants later put Inspector Black on the stand to testify to certain statements made by Ms. Meloff, Mr. Brooks, and Mr. Canty. Defense counsel had Inspector Black testify from selected passages from his notes; the excerpts selected by counsel gave the impression that these witnesses had not implicated defendants at the time of the investigation. The government then invited Inspector Black to put his previous testimony in context by describing how Ms. Meloff and Mr. Brooks had in fact implicated Mr. Grabski, as reflected by portions of the notes Inspector Black had not been asked to address.
 
 
 25
 There was a similar exercise with witness Archie Millben, a State of Michigan investigator.
 
 
 26
 Evidence of prior consistent statements of a declarant available at trial for cross-examination is not hearsay and is admissible as substantive evidence if offered to rebut an express or implied charge that the declarant has been guilty of recent fabrication. Fed.R.Evid. 801(d)(1)(B). Defendant relies on United States v. West, 670 F.2d 675, 687 (7th Cir.), cert. denied, 457 U.S. 1124, and 457 U.S. 1139 (1982), for the proposition that evidence of the prior consistent statement must be elicited from the declarant, not a third party. The government cites numerous cases from other circuits holding that a third party may be used if the declarant testified and had been subject to cross-examination sometime during trial.[1]
 
 
 27
 This court has accepted the majority rule in a tort case. Baker v. Elcona Homes Corp., 588 F.2d 551, 559 (6th Cir.1978), cert. denied, 441 U.S. 933 (1979). There, after a policeman had left the stand, the defendants were allowed to introduce a police report in which the officer reported a statement by one of the defendants that was consistent with the testimony the defendant gave when called for cross examination as part of the plaintiffs' case in chief. The statement tended to refute a suggestion that his testimony differed from what he had said earlier. We see no reason not to follow Baker and the majority rule in a criminal case.
 
 
 28
 The statements of Meloff, Brooks, and Canty were consistent with their prior testimony, the three were present at trial to be cross-examined, and evidence of the statements was offered to rebut a charge of recent fabrication. The defendants could have recalled those witnesses for cross-examination, and they were not unfairly prejudiced because they chose not to do so.
 
 D
 
 29
 Appellant Grabski maintains, finally, that the prosecution improperly implied that the jury should draw an adverse inference from the defendants' failure to call witnesses.
 
 
 30
 In closing arguments, counsel for both defendants made reference to the absence of a number of potential witnesses, claiming that their testimony would have been "very helpful" in deciding the case. In response, the prosecutor said this:
 
 
 31
 "There's many comments made about the Government not calling certain witnesses. That is correct, we didn't call the employers. For what. What is the point coming and saying no, the person didn't work for us. Mr. Roberts did, and that is exactly the answer he got. The people didn't work there. You know that. Why would they have to be called in.
 
 
 32
 The defendants do not have to put on a case. They have the right not to. But they can subpoena any witness they want to just like the Government. If they want a witness to come in this courtroom, they have the right to subpoena that witness. So if they say a witness would have been favorable to them and the Government did not call them, think to yourself and ask yourself why didn't they subpoena that witness."
 
 
 33
 Defense counsel immediately objected. The court responded, "I think the jury understands, and will be told that the burden is not on the defense to call any witness. The burden is always on the Government to prove guilt beyond a reasonable doubt." The court's general charge also explained that the defendants had no burden of proof.
 
 
 34
 Mr. Grabski argues that the prosecutor had to obtain permission from the court before inviting the jury to draw an adverse inference from the defendants' failure to call witnesses. United States v. Martin, 696 F.2d 49 (6th Cir.), cert. denied, 460 U.S. 1073 (1983). The government replies that the prosecutor's remarks were provoked, bringing this case within the ambit of United States v. Young, 470 U.S. 1 (1985) (impugning the prosecutor's integrity), and United States v. Davis, 809 F.2d 1194, 1209 (6th Cir.) (bolstering witness's credibility after defense attack based on facts not in evidence), cert. denied, 483 U.S. 1007, and 483 U.S. 1008 (1987). Those decisions allowed the prosecutor to respond to the provocation.
 
 
 35
 We need not address either argument. If there was any impropriety, it was not "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." United States v. Thomas, 728 F.2d 313, 320 (6th Cir.1984). "[T]he prejudicial effect of improper comment or questioning may be negated by curative instructions to the jury." Id. The cautionary instruction given at the time of objection and the general instructions given later were more than adequate to cure anything that needed curing. Taken in context, the prosecutor's remark certainly did not vitiate the fairness of the trial.
 
 
 36
 AFFIRMED.
 
 
 
 *
 The Honorable Ronald E. Meredith, United States District Judge for the Western District of Kentucky, sitting by designation
 
 
 [1]
 United States v. Provenzano, 620 F.2d 985, 1000-02 (3d Cir.), cert. denied, 449 U.S. 899 (1980); United States v. Dominguez, 604 F.2d 304, 311 (4th Cir.1979), cert. denied, 444 U.S. 1014 (1980); United States v. Allen, 579 F.2d 531, 532-33 (9th Cir.), cert. denied 439 U.S. 933 (1978); United States v. Lanier, 578 F.2d 1246, 1255-56 (8th Cir.), cert. denied, 439 U.S. 856 (1978); United States v. Zuniga-Lara, 570 F.2d 1286, 1287 (5th Cir.), cert. denied, 436 U.S. 961, (1978); United States v. McGrath, 558 F.2d 1102, 1107 (2d Cir.1977), cert. denied, 434 U.S. 1064 (1978)