UNITED STATES of America,
Plaintiff–Appellee,

v.

Marilyn Kay KELLEY,
Defendant–Appellant.

Nos. 90–6136, 90–6148.

United States Court of Appeals,
Tenth Circuit.

April 8, 1991.

Robert G. McCampbell, Asst. U.S. Atty. (Timothy D. Leonard, U.S. Atty., with him, on the brief), Oklahoma City, Okl., for plaintiff-appellee.

Randy Alan Bauman, Oklahoma City, Okl., for defendant-appellant.

Before LOGAN, SEYMOUR, and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

In a ten-count indictment Marilyn Kay Kelley was charged in one count with conspiring with her daughter, LaDena Dunning, and others to commit bank fraud and mail fraud, in violation of 18 U.S.C. § 371; in four counts with bank fraud in violation of 18 U.S.C. §§ 1344 and 2; in four counts with mail fraud in violation of 18 U.S.C.

§§ 1341 and 2; and in one count with money laundering in violation of 18 U.S.C. § 1957(a). Kelley was tried jointly with her daughter, LaDena Dunning. A jury convicted Kelley on all ten counts, and pursuant to the Sentencing Guidelines she was sentenced to fifty months imprisonment on each count to be served concurrently. Kelley now appeals her several convictions and sentences.[1]

At trial, Kelley did not testify nor were any witnesses called in her behalf. This is mentioned merely to show that all the evidence adduced at trial was presented by the government. It was the government's theory of the case that Kelley and Dunning organized a business entity known as Shannon Financial in which they were both corporate officers; that through the use of this company they conspired together and with others to commit bank fraud and mail fraud; and that loans were obtained from three federally insured banks by means of false pretenses. Further, it was alleged that Kelley also obtained loans from I.T.T. Financial Corporation by means of false pretenses and that during the course of these particular transactions loan approval notices were delivered by the United States Postal Service from I.T.T.'s parent office in Englewood, Colorado, to I.T.T.'s local office in Oklahoma City, Oklahoma.

On appeal, Kelley contends that her several convictions should be reversed for the following reasons: (1) insufficient evidence to support the four mail fraud convictions; (2) insufficient evidence to show that either the banks or I.T.T. sustained any pecuniary loss; (3) insufficient evidence of an unlawful conspiracy; and (4) insufficient evidence to show that any money laundering transaction was "in or affecting interstate commerce."

Kelley, with the help of others, made several loan applications to I.T.T. in Oklahoma City, Oklahoma which were sup-

ported by false documents.[2] The loan applications were sent to I.T.T.'s parent company in Englewood, Colorado, for approval. They were apparently either faxed or sent by Federal Express or other courier to Englewood, Colorado. In any event, it was the government's theory of the case that these loan applications were reviewed by the parent company in Englewood, Colorado, marked "approved," if such was the case, and then sent through the United States Mail to the local I.T.T. office in Oklahoma City, Oklahoma. It would appear that a loan advancement was occasionally made based on telephone notification with the balance of the loan being made after the loan application approval was received in the Oklahoma City office. Further, it would appear that one loan was made even though the loan application was received back in Oklahoma City office with the "loan approved" notation missing.

Steve Brown, vice-president of operations for I.T.T.'s Englewood, Colorado office, testified that the approved loan applications received from the local Oklahoma City, Oklahoma office were invariably sent by mail back to the Oklahoma City office. On cross-examination, Brown conceded that some business documents were faxed or sent by Federal Express or other courier, but he still insisted, on redirect examination, that approvals of loan applications were returned to the local Oklahoma City office by mail. Proof of mailing by showing an established business practice to mail is sufficient circumstantial evidence to require submission of the mailing issue to a jury. *United States v. Sumnicht*, 823 F.2d 13, 15 (2d Cir.1987); *United States v. Brickley*, 426 F.2d 680, 684 (8th Cir.), *cert. denied*, 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970); *United States v. Doran*, 299 F.2d 511, 514 (7th Cir.), *cert. denied*,

---

1. LaDena Dunning was convicted on three counts, and by separate appeal sought reversal of her convictions and sentences. Except for the district court's restitution order, Dunning's convictions and sentences have now been affirmed contemporaneously with the filing of the present opinion. *See United States v. Dunning*, 929 F.2d 579 (10th Cir.1991).

2. One Harold Ferry was the branch manager of I.T.T.'s Oklahoma City office and he allegedly was one of Kelley's co-conspirators. At trial, Ferry was a government witness.

370 U.S. 925, 82 S.Ct. 1563, 1565, 8 L.Ed.2d 504, 505 (1962).

 Counsel also argues that any mailing must be in furtherance of the scheme to defraud in order to come within the mail fraud statute. In this regard, counsel points out that, based on telephone conversations, some loan advancements were made before the Oklahoma City office received back the "approved" loan application. Such, however, would not negate the government's evidence that: The usual procedure was for the Oklahoma City I.T.T. office to forward loan applications to its Englewood, Colorado office; the loan applications would then be reviewed and marked approved, if such was the case; the applications would then be returned via the U.S. Mail to Oklahoma City; and finally the loan would be made. In a mail fraud case it is not necessary that the mailing predate the defendant's receipt of the money. *United States v. Sampson*, 371 U.S. 75, 80–81, 83 S.Ct. 173, 175–76, 9 L.Ed.2d 136 (1962); *United States v. Bottom*, 638 F.2d 781, 785 (5th Cir.1981); *Sparrow v. United States*, 402 F.2d 826, 829 (10th Cir.1968). Further, mailings which facilitate concealment of a fraudulent scheme meet the "furtherance" requirement. *United States v. Walker*, 915 F.2d 1463, 1466 (10th Cir.1990); *United States v. Rauhoff*, 525 F.2d 1170, 1176 (7th Cir.1975). In the instant case there was testimony that if the approved loan application was not in the file at the local Oklahoma City office, there would be an internal investigation which would have disclosed the irregularities.

In sum, we think the evidence concerning the use of the mails and the evidence that the use was in furtherance of the false scheme was such as to require submission of those issues to the jury.

 Counsel next argues that an essential element of both the bank fraud and mail fraud charges was that the banks and I.T.T. suffered an "actual pecuniary loss" as a result of Kelley's fraudulent scheme. Counsel notes that in this regard the indict-

ment did not allege any actual pecuniary loss either to the banks or I.T.T., that the instructions did not inform the jury that an actual pecuniary loss was an essential element of the crimes charged, and further, that there was little or no evidence of any such pecuniary loss. This argument misconceives the law on this matter. The gist of both the bank fraud charges and the mail fraud charges is devising and executing, or intending to execute, a scheme to defraud, and the ultimate success or failure of the scheme is immaterial. In other words, the government does not have to prove that the victim suffered actual pecuniary loss from the scheme. *See United States v. Stewart*, 872 F.2d 957 (10th Cir. 1989) (listing cases).[3] And the truth of the matter is that there was evidence of actual pecuniary loss to the banks and I.T.T. The fact that in one instance, for example, a recoupment was made through the sale of collateral is of no moment.

The conspiracy count charged Kelley and others with conspiring to commit bank fraud and mail fraud. Counsel argues that because some, if not all, of the underlying charges of bank fraud and mail fraud should be reversed, the conspiracy charge, being in the disjunctive, must necessarily fail. We need not resolve that particular matter since we are affirming the convictions for bank fraud and mail fraud.

Count 9 charged Kelley with obtaining a loan in the sum of $36,864.85 from I.T.T. by means of a mail fraud. Count 10 charges Kelley with money laundering a portion of the monies thus obtained from I.T.T. by purchasing an automobile from Fred Jones Lincoln Mercury. Counsel argues that since Kelley's conviction on Count 9 must be reversed, her conviction on Count 10 cannot stand. As indicated, we are affirming Kelley's conviction on Count 9 so her conviction on Count 10 cannot be set aside for the reason given.

 Counsel also argues that any money laundering transaction was not "in

---

**3.** Kelley's reliance on *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) is misplaced. There the Supreme Court held that the mail fraud statute does not extend "to the intangible right of the citizenry to good government." *Id.* at 356, 107 S.Ct. at 2879.

or affecting interstate commerce" as required by the money laundering statute. 18 U.S.C. § 1957(a). In this regard, there was evidence that the automobile Kelley purchased was manufactured in Michigan and was sold to her by a local car agency which was itself engaged in interstate commerce and that monies paid the car agencies by Kelley would, in part, be used to purchase other vehicles and automotive parts from outside Oklahoma. The requirement that the transaction be "in or affecting interstate commerce" must be met in order to confer jurisdiction on federal courts. Such, however, is not an essential element of the crime charged.

The parties are in substantial agreement that the "in or affecting interstate commerce" requirement has been broadly read and that a "minimal effect" on interstate commerce is sufficient to establish federal jurisdiction. In statutes analogous to 18 U.S.C. § 1957 a minimal effect on interstate commerce is sufficient to confer federal jurisdiction. *See e.g., United States v. Robinson,* 763 F.2d 778, 781 (6th Cir.1985) (18 U.S.C. § 1962(c)); *United States v. Worley,* 751 F.2d 348, 351 (10th Cir.1984) (18 U.S.C. § 1951(a)); *United States v. Zabic,* 745 F.2d 464, 470 (7th Cir.1984) (18 U.S.C. § 844(i)); *United States v. Rone,* 598 F.2d 564, 573 (9th Cir.1979) (18 U.S.C. § 1962(c)), *cert. denied sub. nom.,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). Counsel has not drawn our attention to any case which would suggest a reversal of Kelley's conviction on Count 10. We think the evidence is sufficient to confer federal jurisdiction.

█ Sometime after the jury returned verdicts convicting Kelley on all ten counts of the indictment, counsel filed a motion for new trial based on newly discovered evidence. The district court denied the motion without a hearing. On appeal, counsel argues that such was error.

In support of the motion for a new trial, counsel offered two affidavits. One affidavit was that of Barbara Quattlebaum. Ms. Quattlebaum testified before the grand jury that returned the indictment against Kelley, although she did not testify at trial

of the matter. In her affidavit Ms. Quattlebaum stated that her testimony before the grand jury was false and also that the testimony of her husband, Mr. Quattlebaum, and two other government witnesses at trial, was false. The other affidavit in support of the motion for a new trial was the affidavit of counsel to the effect that this evidence was newly discovered.

█ Counsel agrees that before a new trial on the ground of newly discovered evidence may be granted, the allegedly newly discovered evidence must be more than merely impeaching or cumulative. It must also be material to the issues involved and must be such as would probably produce an acquittal. And further, that such a motion is not regarded with favor and should only be granted with great caution. In any event, the denial of a motion for a new trial is addressed to the sound discretion of the trial court. *United States v. Page,* 828 F.2d 1476, 1478 (10th Cir.), *cert. denied,* 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987); *United States v. Sutton,* 767 F.2d 726, 729 (10th Cir.1985); and *United States v. Ramsey,* 726 F.2d 601, 605 (10th Cir.1984). Our review of the matter convinces us that the present motion does not measure up to that test. This is not a case of a government witness at trial recanting his or her trial testimony. Ms. Quattlebaum was not a government witness at trial. Ms. Quattlebaum's affidavit that her husband, or other government witnesses, testified incorrectly at trial is merely impeaching. The district court did not err in summarily denying the motion for a new trial.

█ At sentencing, the district court, acting upon a pre-sentence report, added four points to Kelley's base offense level because of her leadership role in the ongoing criminal activity. U.S.S.G. § 3B1.1(a). On appeal, counsel argues this was error. We disagree with counsel. The district court's determination that Kelley had a leadership role is reviewed by us under the clearly erroneous standard. *United States v. Beaulieu,* 893 F.2d 1177, 1181–82 (10th Cir.1990), *cert. denied,* —— U.S. ——, 110 S.Ct. 3302, 111 L.Ed.2d 811

(1990). The record clearly indicates that Kelley gave orders, came up with ideas, handled the finances, and organized Shannon Financial which was the business entity doing business with the victim banks and I.T.T. To be sure, there were others involved, but the district court's determination that Kelley was a leader in this ongoing criminal activity is not clearly erroneous.

■ As indicated, Kelley was sentenced to fifty months imprisonment on all ten counts, to be served concurrently. Upon the completion of this sentence she was to be placed on three years of supervised release. Further, she was ordered to make restitution to First Interstate Bank in the amount of $33,000 and to I.T.T. in the amount of $159,092. On appeal, counsel argues that given Kelley's age (*i.e.*, 60 years of age at time of sentencing) and her work experience, it would be impossible for her to make such restitution and asks that the restitution order be vacated.[4] We agree.

At the time the district judge ordered Kelley to pay a total of $192,092 restitution to her victims, the district court recognized that she had no present ability to pay anything. However, the district judge justified the restitution order on the pre-sentence report which he said indicated that Kelley had "substantial employment opportunities and substantial entrepreneurial skills which make a restitution order appropriate in this case."

We find nothing in the pre-sentence report which supports the statement that because of possible future employment opportunities and entrepreneurial skills, Kelley, at some future date after her release from prison, would be able to repay $192,092. *United States v. Rogat,* 924 F.2d 983 (10th Cir.1991) sheds light on the restitution order.

In *Rogat,* the defendants were ordered to make restitution in the sum of $2,449,-142.48, and, on appeal, we affirmed the

restitution order. In so doing, we stated that present indigency is not a bar to restitution and that a restitution order would be upheld in circumstances where "the evidence indicates a defendant has some assets or earning potential and thus possibly may be able to pay the amount ordered." Here there is nothing to indicate any present assets, hidden or otherwise. Further, we find nothing to indicate that Kelley has "earning potential" such as to support a restitution order of this magnitude.

The restitution order is reversed. Otherwise the judgments and sentences are affirmed.

---

**4.** The challenge to the restitution order was not raised by Kelley until her reply brief. Accordingly, the government made no mention of the matter in its answer brief, but the issue was fully argued in the companion appeal involving Kelley's daughter. *See United States v. Dunning,* 929 F.2d 579 (10th Cir.1991).