Victoria S. HILLMAN, Plaintiff,

v.

UNITED STATES POSTAL SERVICE, William F. Henderson, Postmaster General, Defendant.

No. 97–4041–SAC.

United States District Court, D. Kansas.

Sept. 14, 2001.

Victoria S. Hillman, Osborne, KS, pro se.

D. Brad Bailey, Office of United States Attorney, Topeka, KS, for defendants.

Nancy Landis Caplinger, Office of United States Attorney, Topeka, KS, for William J. Henderson.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This employment discrimination and retaliation case comes before the court on defendant United States Postal Service ("USPS")7Ds renewed motion for judgment as a matter of law, or in the alternative for a new trial, or remittance of the compensatory damage award. (Dk 161). The court will also rule on plaintiff's motion to deny defendant's supplement to memorandum in support of defendant's renewed motion for judgment as a matter of law, or in the alternative for a new trial, or remittance of the compensatory damage award (Dk.172). The court incorporates herein its findings made in its separate memorandum and order filed today in this

case which addresses, among other matters, the issues of front and back pay.

On May 18, 2001, the jury returned a verdict for the plaintiff on her retaliation claim, and for the USPS on plaintiff's sex discrimination claim. The jury awarded plaintiff compensatory damages in the amount of $80,000 for plaintiff's pain, suffering and emotional distress, based upon its finding of retaliation.

### Standards for motion for new trial

■ Fed.R.Civ.P. 59(a) authorizes the court to grant a new trial to all or any of the parties on all or part of the issues "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." A trial court has broad discretion in deciding whether to grant or deny a motion for a new trial. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). In considering the motion, the court should "exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial." *McDonough Power Equipment*, 464 U.S. at 553, 104 S.Ct. 845.

■ The motion may be granted where the court believes the verdict is against the weight of the evidence or prejudicial error has occurred. *Anderson v. Phillips Petroleum Co.*, 861 F.2d 631, 637 (10th Cir.1988). It is the burden of the moving party to demonstrate that the trial errors are prejudicial errors or that the verdict is not based on substantial evidence. *White v. Conoco, Inc.*, 710 F.2d 1442, 1443 (10th Cir.1983).

■ When the issue concerns the verdict being against the weight of the evidence, the trial court in the exercise of its discretion reviews the evidence. *Black v. Hieb's Enterprises, Inc.*, 805 F.2d 360, 363

(10th Cir.1986). The record is viewed in the light most favorable to the prevailing party. *Patton v. TIC United Corp. .*, 77 F.3d 1235, 1242 (10th Cir.), *cert. denied*, 518 U.S. 1005, 116 S.Ct. 2525, 135 L.Ed.2d 1049 (1996). The motion is not to be granted unless the verdict is clearly, decidedly, or overwhelmingly against the weight of the evidence. *Id.; Continental Cas. Co. v. Southwestern Bell Telephone Co.*, 860 F.2d 970, 972 (10th Cir.1988), *cert. denied*, 489 U.S. 1079, 109 S.Ct. 1530, 103 L.Ed.2d 836 (1989). "A new trial is not warranted simply because the court would have reached a different verdict." *Boyce v. Board of Com'rs of Dickinson County*, 857 F.Supp. 794, 797 (D.Kan.1994) (citations omitted).

■ Because of the sanctity attached to jury verdicts, courts do not lightly overturn them. *Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493, 502 (10th Cir.1983). Thus, motions for new trial are " 'not regarded with favor and should only be granted with great caution.' " *Maberry v. Said*, 927 F.Supp. 1456, 1459 (D.Kan. 1996) (*quoting United States v. Kelley*, 929 F.2d 582, 586 (10th Cir.), *cert. denied*, 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991)).

■ In determining whether a new trial is appropriate, the trial court does not sit merely as an additional juror. *VDA de Perez v. Hospital del Maestro*, 910 F.2d 1004, 1006 (1st Cir.1990). The trial court must " 'feel that the jury quite clearly reached a seriously erroneous result in spite of the clear weight of the evidence.' " *Leichihman v. Pickwick Intern.*, 814 F.2d 1263, 1267 (8th Cir.) (*quoting Leichihman v. Pickwick International, Inc.*, 589 F.Supp. 831, 834 (D.Minn.1984)), *cert. denied*, 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 116 (1987).

■ " 'Neither an error in the admission or exclusion of evidence nor an error in a ruling or order of the court, nor anything done or omitted by the court, can be grounds for granting a new trial unless the error or defect affects the substantial rights of the parties.' " *Sanjuan v. IBP, Inc.*, 941 F.Supp. 1000, 1004 (D.Kan.1996) (*quoting Courtney v. Safelite Glass Corp.*, 811 F.Supp. 1466, 1471 (D.Kan.1992)); *see Heyen v. United States*, 731 F.Supp. 1488, 1489 (D.Kan.1990), *aff'd*, 945 F.2d 359 (10th Cir.1991). In short, a court is to "ignore errors that do not affect the essential fairness of the trial." *McDonough Power Equip. Inc.*, 464 U.S. at 553, 104 S.Ct. 845.

**Standards for judgment as a matter of law**

■ A court may grant a motion for judgment as a matter of law ("JMAL") only when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R.Civ.P. 50(a)(1). The Tenth Circuit reads this rule to mean that "a court may grant the motion 'only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.' " *Finley v. United States*, 82 F.3d 966, 968 (10th Cir.1996) (*quoting Q.E.R., Inc. v. Hickerson*, 880 F.2d 1178, 1180 (10th Cir.1989)), *rev'd on other grounds*, 123 F.3d 1342 (10th Cir. 1997) (*en banc*). The court "must construe the evidence and inferences most favorably to the non-moving party, and refrain from weighing the evidence, passing on the credibility of witnesses, or substituting our judgment for that of the jury." *Magnum Foods, Inc. v. Continental Cas. Co.*, 36 F.3d 1491, 1502 (10th Cir.1994) (citation omitted); *see Harolds Stores, Inc. v. Dillard Department Stores*, 82 F.3d 1533, 1546 (10th Cir.), *cert. denied*, 519 U.S. 928, 117 S.Ct. 297, 136 L.Ed.2d 216 (1996).

■ On the other hand, judgment as a matter of law must be granted if there is no legally sufficient evidentiary basis with respect to a claim or defense under the controlling law. *Harolds Stores, Inc.*, 82 F.3d at 1546–47. In order to deny judgment as a matter of law, the court must find more than merely "a scintilla of evidence" favoring the nonmovant, and the court must find that "evidence was before the jury upon which it could properly find against the movant." *Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1547 (10th Cir.1988). Judgment as a matter of law is only proper when "the evidence so strongly supports an issue that reasonable minds could not differ." *Ryder v. City of Topeka*, 814 F.2d 1412, 1418 (10th Cir.1987).

While the trial court has the authority under Rule 50(a) to grant a motion for judgment as a matter of law at the close of the plaintiffs' case, the more prudent course is to defer ruling until both sides have rested. 9A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2533 at p. 318 (1995); *Therrell v. Georgia Marble Holdings Corp.*, 960 F.2d 1555, 1569 (11th Cir.1992) (" 'Where there is any doubt at all as to the propriety of a directed verdict, district courts should not jump the gun but should wait until both sides have presented their evidence before ruling on motions for directed verdict.' *United States v. Vahlco Corp.*, 720 F.2d 885, 889 (5th Cir.1983).").

**Issues**

USPS alleges that the facts do not support the jury's verdict in favor of plaintiff on her retaliation claim, and that it was denied a fair trial due to evidentiary issues.

## I. *Retaliation*

Neither party disputes the correctness of the court's instructions to the jury, requiring the jury to find that plaintiff engaged in protected conduct, that USPS contemporaneously or thereafter engaged in adverse employment activity against plaintiff, and that retaliation for plaintiff's protected conduct was a motivating factor in USPS's adverse employment decision. USPS concedes that plaintiff conferred with an EEO officer on Sept. 13, 1993, and that such constitutes protected activity, but challenges the evidence in support of the jury's finding of adverse employment action and a causal connection between that action and plaintiff's protected conduct.

*Adverse Employment Action*

The Tenth Circuit liberally construes the phrase "adverse employment action." *See Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir.1998).[1] USPS does not challenge the fact that the denial of employment would constitute adverse employment action, but contends solely that no such employment was available at Smith Center in 1993.

■■■ USPS relies upon testimony from Virginia Niblack, the postmaster at Smith Center who hired plaintiff. Niblack testified that plaintiff was hired as a casual employee for only one 90-day period, and that she neither considered extending plaintiff's appointment as a casual nor

hired anyone as a casual employee after plaintiff's initial 90-day appointment expired. The record supports the conclusion, however, that there was an opening at Smith Center at the relevant time for another 90-day casual position, for which plaintiff was qualified.[2] Plaintiff began her employment as a casual employee at Smith Center on June 26, 1993. Plaintiff testified that she was told during her interview for her initial 90-day appointment that her casual appointment may be renewed for another 90 days, and that during the initial or second 90-day appointment when the hiring freeze was lifted, a part-time flex (PTF position) would be available to plaintiff. Plaintiff testified that Niblack had said plaintiff would be working at least through October 4th, and that she would be working when Rice was gone. (R. p. 573-74).

Connie Rice, the full-time regular career carrier who trained plaintiff, testified that plaintiff was going to be carrying her route when she left on detail for 90 days to another post office. (R. p. 212-13). Niblack agreed that plaintiff was hired because "Rice was going out on a 90-day detail and [she] did not have enough people to cover the routes." (R. p. 827). Testimony was uncontroverted that Rice went on detail on August 26, 1993, and that Niblack anticipated Rice would remain there until approximately Dec. 1, 1993. (Rec. p. 877-78). Niblack agreed that

---

1. The Tenth Circuit has held that actions having an adverse impact on future employment opportunities can constitute adverse employment actions for purposes of Title VII retaliation claims. *See Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir.1996); *Toth v. Gates Rubber Co.*, 216 F.3d 1088, 2000 WL 796068, at *9–*10 (10th Cir. June 21, 2000) (Table); *Griffis v. City of Norman*, 232 F.3d 901, 2000 WL 1531898, at *8 (10th Cir. Oct.17, 2000) (Table); *Cf. Meredith v. Beech Aircraft Corp.*, 18 F.3d 890 (10th Cir.1994) (former employee's performance evaluation,

completed after she filed sex discrimination complaint, was not "adverse action" where her evaluation marks were satisfactory and she failed to show that they were unfavorable). Here, the jury was not instructed on this theory, and the parties' contentions are focused upon defendant's adverse act of not rehiring plaintiff at Smith Center in 1993.

2. Defendant concedes this point, in stating "plaintiff could have been reappointed, but only for another 90 days." (Dk.171, p. 3).

plaintiff was hired to carry the mail to cover for Rice, who would be gone on detail, and Linda Dettmer, who was on light duty due to pregnancy. (R. p. 826–30, 848). Niblack's stated reason for not considering extending plaintiff's casual appointment for another 90 days was that "[Rice] was returning from her detail and plaintiff wouldn't be needed." (R. p. 836).

Yet when Niblack canceled plaintiff's appointment as a casual on Sept. 25, 1993, (Def.Exh. D 4), Rice had only been gone on detail one month. Although Niblack had approved the switch of Kent Kennedy from clerk craft to carrier craft and Linda Dettmer from carrier craft to clerk craft on August 27, 1993, the day after Rice left on detail, this switch accounted only for Dettmer's inability to carry mail and had no impact upon Rice's absence. Niblack agreed on cross-examination that Rice and Dettmer would still be unavailable for over 65 days after the date Niblack canceled plaintiff's casual appointment. (R. p. 879). By all accounts, plaintiff was hired to carry mail in Rice's absence, yet Rice was still absent when plaintiff was terminated.

Sufficient evidence additionally supports a finding that a PTF career carrier position was available in Smith Center at the relevant time. Plaintiff testified that she was told during her interview for her initial 90–day appointment that her casual appointment may be renewed for another 90 days, and that during the initial or second 90–day appointment, a part-time flex (PTF position) would open up, which plaintiff could fill if she chose. (Rec. P. 383–384, 403, 490–94). Plaintiff testified that during her tenure at Smith Center, she was increasingly given additional responsibilities. (R. p. 403). Evidence of the shortage of persons available to carry the mail on the city routes in Smith Center during plaintiff's tenure there supports plaintiff's position. (See e.g., p. 378–80,

399, 456–458, 827; Plaintiff's Exhs. 117, 123, 128; Def. Exh. D–7).

Rice testified that her husband, who was also a postal employee at another location, requested a transfer into Smith Center and when the hiring freeze was lifted, was interviewed for and was offered the position of PTF carrier. (R. p. 163–164, 168, 222–23). He requested the transfer to relieve the mail carriers, including his wife, who were working overtime. (Id.) Rice testified during previous sworn testimony that she believed the USPS was conspiring to prevent plaintiff from being employed there, although she testified to the contrary at trial. (R. p. 191, 194–198).

Nunemaker, the union steward, testified that there was a need to hire more career PTF carriers at Smith Center, but that he was unaware whether or not a PTF position existed there at the relevant time. (R p. 768–69). Niblack testified that "there was not a PTF carrier job available, because Connie Rice was returning to her duties as a full-time carrier," (R. p. 312). The court finds this testimony unpersuasive, given the undisputed fact that Rice was gone on detail for weeks after plaintiff was terminated. Although Niblack contradicted plaintiff's testimony (see e.g., R. p. 234), the court chooses to credit plaintiff's testimony, as did the jury.

USPS's further asserted that no PTF was available or needed at Smith Center because clerks could carry the mail, or "cross-craft," i.e., a person in the clerk craft could perform work normally designated to be done by one in the carrier craft, and vice versa. Evidence on this issue was conflicting. This assertion, although supported by some evidence, was also contradicted by other evidence sufficient to refute it, including but not limited to the following: 1) testimony that cross-crafting was prohibited by the union agreement and was at some point shut off

at Smith Center; 2) testimony that carrier Rice successfully stopped a clerk from casing her mail in Smith Center by filing a grievance with the union; 3) evidence that clerk Kent Kennedy and carrier Linda Dettmer formally requested and received approval to switch crafts while plaintiff was employed as a casual at Smith Center, rather than continuing their previous practice of cross-crafting, even though both forfeited their seniority earned in their previous crafts by so doing (Exh. D–12). Thus the jury could properly have rejected USPS's cross-crafting theory.

Curiously, plaintiff did not offer at trial evidence submitted in support of her summary judgment motion, consisting of testimony from Terri Kingsbury, a transitional employee ("TE") at Smith Center at the time. Kingsbury stated that Niblack told her on September 24, 1993, the day before Niblack decided not to reappoint plaintiff, when Kingsbury's one year appointment as a TE clerk was about to expire, that Niblack would "like to keep [her] on as a PTF carrier because she needed a carrier." (See this court's memorandum and order, Dk. 118, p. 19). Nonetheless, the evidence presented at trial, viewed in the light most favorable to the plaintiff, is sufficient to support the jury's finding that a position existed at the time and that USPS took adverse action against plaintiff in not reappointing her to a second casual 90–day position and/or a PTF position in Smith Center in the fall of 1993.

*Causal Connection*

USPS next alleges that there was no causal connection between USPS's nonappointment of plaintiff to a position and plaintiff's protected conduct. USPS points out that plaintiff was removed from the work schedule on Sept. 11, 1993, before she first spoke to an EEO officer on Sept. 13, 1993. USPS further contends that even if her removal from the work schedule on Sept. 11th is immaterial, there is no

evidence that plaintiff's supervisor, Niblack, had any knowledge of plaintiff's protected conduct on or before Sept. 25th, the date she decided not to reappoint plaintiff to another 90 day casual position.

*Removal From Work Schedule*

Evidence was uncontradicted that plaintiff was removed from the work schedule on Sept. 11, 1993, before she spoke to the EEO officer on Sept. 13, 1993. The crucial issue is what the impact was of plaintiff's removal from the work schedule. Plaintiff testified that many changes were made in her work schedule throughout her employment, and that even when she was scheduled to work certain hours on certain days, changes were made on short notice. Plaintiff testified that she did not work every day during her 90–day appointment, and that it was common for Niblack to change the schedule and remove or change the hours she had been scheduled to work (R. p. 392, 397, 402, 405, 406, 446–47).

Niblack testified that as a rule, casual employees are just called in and not scheduled at all, but that she scheduled plaintiff a week in advance. (R. p. 334, 833). Plaintiff testified that when Niblack told her on Sept. 11th that she had changed the work schedule, or erased plaintiff from the schedule for the next week, that Niblack stated that she would call plaintiff. (R. p. 575). Plaintiff assumed that Niblack was just going to reschedule her. (R. p. 565, 568–69).

No testimony established that plaintiff was removed from the work schedule on Sept. 11th for the remainder of her 90–day term. Although plaintiff did not work after Sept. 11th, the jury could reasonably have inferred that plaintiff was removed from the schedule on Sept. 11th for only one day (See Exh. D 7), or one week. In light of this testimony, the jury could reasonably have found that Niblack's removal of plaintiff from the work schedule on

Sept.11th did not evidence Niblack's intent on that date not to permit plaintiff to work thereafter. Accordingly, Niblack's adjustment of plaintiff's work schedule on Sept. 11th does not preclude a finding of causation.

*Niblack's Knowledge*

■■■ The court thus examines whether sufficient evidence shows that Niblack had knowledge of plaintiff's protected conduct before she terminated plaintiff's appointment on Sept. 25, 1993. The evidence on this issue was sharply conflicting.

Niblack denied any knowledge of plaintiff's EEO activity until after Sept. 25, 1993. However, when asked about Niblack's failure to convey alleged complaints about plaintiff to plaintiff, Niblack equivocated by stating to plaintiff: *"towards the end of your employment,* when you were no longer employed and everything, then the EEO came out." (R. p. 864) (emphasis added). Niblack's testimony about hiring plaintiff to cover for Rice, but terminating plaintiff approximately two months before Rice was due to return from her detail elsewhere gives rise to a reasonable inference that something caused Niblack to change her mind about appointing plaintiff to a second term as a casual.

Plaintiff testified that she spoke to union steward Nunemaker on Sept. 10, 1993. Nunemaker agreed that he had advised plaintiff on that date to file an EEO case. (R. p. 766). Plaintiff testified that Nunemaker told her that he called Niblack and informed Niblack that he had told plaintiff to file an EEO. (Record p. 447, 570). Nunemaker testified that he usually contacts management within fourteen days of receiving a complaint, (Rec. p. 753) but never spoke to Niblack about plaintiff's complaint. (Rec. p. 768). When Niblack was asked whether Nunemaker called her on Sept. 10, 1993, or on any date prior to Sept. 25, 1993, to inform Niblack of his advice that plaintiff contact an EEO offi-

cer, Niblack testified that she did not recall. (R. p. 252, 837).

It is uncontested that plaintiff called Niblack's supervisor, Robert Jerby, on Monday, Sept. 13, 1993, (*see* Plaintiff's Exh. 142C) and that he recommended that she contact the EEO officer, which she did that day. On September 14th, EEO officer Espinoza sent plaintiff a request for counseling form for her completion. (Exh. 20). The form states it must be returned within five days or the request for counseling may be canceled. (Id.). On September 17th, plaintiff returned the completed forms to EEO officer Espinoza.

Espinoza testified that his regular practice was to contact the person complained of after he received the completed forms from the complainant. (Rec. p. 795–796). Espinoza stated the forms reflect that plaintiff signed them on Sept. 17th, and he may have received them back from plaintiff on the 19th. (Rec. p. 799). When plaintiff mailed the forms back to him, they contained all the information he needed to proceed with his inquiry to the managing official, here Niblack. (Rec. p. 799 800). Espinoza testified that usually he reads the completed form, takes notes on what to ask the managing official, then calls the managing official. (Rec. p. 800).

After receiving the completed forms from plaintiff, Espinoza stated that his next step was to talk with Niblack. (*Id.*). Espinoza testified that he "did not recall the date" he contacted Niblack, but remembers calling from the Hicrest Station where he began worked for a few months beginning "approximately October 1, 1993." (Rec. p. 801). Espinoza believed that he spoke with Niblack in October, and did not recall speaking with her on Sept. 15th, 1993. (Rec. p. 817).

Plaintiff testified that Espinoza contacted Niblack before the 25th of September, because Espinoza told her on the 15th of

September that he had already talked to Niblack about plaintiff's complaint. (Rec. p. 450, 570–573.) Espinoza related to plaintiff on the 15th information Niblack had told Espinoza in response to his call to Niblack about plaintiff's EEO complaint. (Id.).

Plaintiff recalled Espinoza's telling her that he would contact Niblack immediately, and in a later telephone conversation before plaintiff received the forms from Espinoza that he had done so. (R. p. 571–73). According to plaintiff, Espinoza departed from his normal procedure because plaintiff was still employed at the time but her initial 90–day term would soon expire, thus time was of the essence. Plaintiff further testified that "everything started to really escalate the very day that I talked to an EEO counselor." (R.P. 456, see 482).

Niblack agreed that plaintiff was hired to carry the mail to cover for Rice during her detail elsewhere, (R. p. 828–30) yet when Niblack canceled plaintiff's appointment as a casual on Sept. 25, 1993, Niblack believed Rice was not due to return from detail for approximately two more months. During plaintiff's employment at Smith Center, PTF carrier Linda Dettmer was on light duty due to her pregnancy, and couldn't carry the mail. (R. p. 182). Although there was no direct evidence that Niblack knew by Sept. 25, 1993, that plaintiff had complained to an EEO officer, the circumstantial evidence is sufficient to give rise to a reasonable belief that Niblack knew by that date of plaintiff's protected conduct.

The verdict rendered by the jury reflects that it chose to credit plaintiff's consistent testimony on this issue over that of Niblack, whose animosity for the plaintiff was evident, and whose credibility was rendered suspect on cross-examination. It would be an invasion of the province of the jury to grant a new trial merely because there was a sharp conflict in evidence. The court thus declines to disturb the jury's verdict.

Because of the close temporal proximity between plaintiff's protected conduct and the adverse action, an inference of causation would be warranted, even absent the above evidence. *See Anderson v.. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999) (*citing Ramirez v. Okla. Dep't of Mental Health,* 41 F.3d 584, 596 (10th Cir.1994)) (holding that a one and one-half-month period between charges of discrimination and an adverse action is short enough to establish causation). Plaintiff thus made a prima facie case of retaliation.

*Legitimate Business Reason Defense*

██ USPS further contends that plaintiff was terminated for legitimate, non-retaliatory reasons. Although USPS alleges that it advanced several such reasons for not extending plaintiff's casual appointment beyond Sept. 25, 1993, the sole reason stated in this motion is that USPS never intended to employ the plaintiff for more than "a short period of time." (Dk.162, p.. 9). To the extent that USPS hereby contends that it never intended to employ the plaintiff for more than 90 days, the evidence discussed above regarding whether an opening existed suffices to refute it.

At trial, the thrust of the business reason defense asserted by USPS was that plaintiff was not a good employee during her initial 90 days employment. In support of that contention, USPS relied upon the testimony of Niblack. When asked in her deposition whether plaintiff performed her duties satisfactorily, Niblack replied: "I do not actually recall what I thought or felt at the time I was supervising [plaintiff]" (R. p. 240–41), in stark contrast to her trial testimony. Rarely has the court seen a witness so unsuccessful in restraining her apparent anger or animosity to-

ward the plaintiff or the proceedings in general. Plaintiff's own testimony and that of Connie Rice, coupled with the evidence discussed below, suffice to refute USPS's business reason defense.

*Pretext*

To the extent pretext was necessary, sufficient evidence is found in plaintiff's impeachment of Niblack's testimony and in Defendant's Exh. D–5, a post-employment evaluation completed by Niblack accompanied by a two page diatribe Niblack wrote about plaintiff's alleged failings and deficiencies. This letter, written approximately six weeks after Niblack decided not to reappoint plaintiff to a second 90–day position, prominently contains among its opening paragraphs the following statements specifying Niblack's reasons why Niblack was not willing to rehire the plaintiff:

Since being released she has filed an sex/age EEO and a congressional against [me] . . .

She is very well know in this area for suing anyone for any reason.

(USPS Exh. D–5).

Niblack was well aware that her post-employment evaluation of plaintiff would be seen by USPS officials who would consider hiring plaintiff in the future. (R. p. 321; Def. Exh. D–5, stating that plaintiff had applied for a position in the Stockton post office and that the form would be considered in evaluating the applicant for employment.) That Niblack chose to include mention of plaintiff's protected activities in a written document explaining her reasons for not recommending plaintiff for future employment with the USPS not only shows that Niblack viewed plaintiff's protected conduct negatively, but also shows that Niblack desired that plaintiff's protected conduct be considered by other selecting officials at USPS who were considering plaintiff for employment.

USPS apparently believes that Exh. D–5 and testimony related thereto is not rele-

vant to Niblack's decision not to extend plaintiff's employment because Niblack wrote the evaluation approximately seven weeks after plaintiff was terminated. The court disagrees. This evidence is relevant to USPS's reaction to plaintiff's EEO complaint, and a trier of fact may infer from this unmerited evaluation that USPS's proffered reason for not reappointing plaintiff was a pretext. *See Griffis v. City of Norman*, 232 F.3d 901, 2000 WL 1531898, at *8 (10th Cir.Oct.17, 2000) (Table) (holding that forged evaluation made two months after plaintiff was passed over for the promotion was relevant to the City's reaction to her grievance, and that trier of fact may infer from it that the City's proffered reason for not promoting her was a pretext), *citing Shaw v. HCA Health Servs. of Midwest, Inc.*, 79 F.3d 99, 100 (8th Cir.1996) (where plaintiff made out a prima facie case and there was evidence that defendant had altered performance evaluations of plaintiff after firing him, "jury was entitled (although not required) to conclude . . . that the reasons given by the hospital for firing [plaintiff] were a pretext for age discrimination.").

Niblack's statement in the post-employment evaluation that plaintiff was very well known for suing anyone for any reason was not supported by evidence. Undisputed evidence showed that plaintiff had never filed any lawsuit except in small claims court for collection of a business debt. (R.P. 454–455, 583). Niblack admitted on cross examination that she had no personal knowledge of any lawsuit involving plaintiff (Rec. p. 328–331).

Although Niblack listed a host reasons unrelated to plaintiff's protected conduct for not rehiring plaintiff, sufficient evidence supports the jury's conclusion that those reasons lacked merit. Although Niblack stated in her post-employment evaluation that she received complaints from

customers about plaintiff, she admitted on cross-examination that she never documented any such complaints, (R. p. 880–882), had no recall of who such complaints were from, could not specify the nature of such complaints, and never brought any complaint to plaintiff's attention while plaintiff was employed. Niblack stated that she did not bring complaints to plaintiff's attention because at the time she did not consider them to be "viable complaints," (Rec. p. 321–325), did not take them seriously, (Id.), and considered them to be mere "fluff." (Rec. p. 338). ·

Niblack also alleged that "everybody that came into the office" complained about plaintiff. Niblack admitted, however, that when a customer's complaint warranted it, she would ask questions of the employees, but never did so with plaintiff. (Rec. p. 338). During plaintiff's employment, Niblack did not consider any complaints she received from customers to be meritorious enough to bring them to plaintiff's attention, yet after plaintiff complained to an EEO officer, Niblack considered them serious enough to be included in a written evaluation to be distributed to other USPS officials who would interview plaintiff for future positions.

Niblack further testified that all plaintiff's co-employees complained about her, (Rec. p. 326, 330–331), but admitted that employees at Smith Center complained about each other as well and that Niblack considered this part of the normal working environment. (R. p. 332). Niblack specified that Connie Rice, who trained plaintiff, complained about her, (Rec. p. 331–32) but Rice testified that she never complained about plaintiff's performance at the Smith Center post office, that she never filed a complaint against plaintiff for any reason, (Rec. p. 169), and that plaintiff was never unfriendly to her. (R. p. 165).

Although USPS did present evidence that some of the comments stated in the post-employment evaluation actually reflected Niblack's opinion of plaintiff's performance, plaintiff is entitled to have the court draw all reasonable inferences from the document, and the testimony about it, in her favor. The court finds the evidence of pretext to be not only sufficient, but overwhelming. The court finds no reason to overturn the jury's verdict or to grant USPS's Rule 50 motion on the issue of retaliation.

## II. *Fair Trial*

USPS next alleges that it was denied a fair trial because of evidentiary matters, namely, the plaintiff's non-compliance with the Federal Rules of Evidence, the court's pretrial orders, evidentiary rulings, and specific instructions. Specifically, USPS complains of the following: evidence that plaintiff was not selected for subsequent positions with USPS; plaintiff's repeated references to "blackballing" and "blacklisting" by USPS; plaintiff's repeated references to EEO proceedings; plaintiff's evidence of the parties financial positions; and plaintiff's improper opening and closing arguments. These will be addressed in turn.

 The decision to contend that plaintiff failed to mitigate her damages was USPS's, not the court's. Because the government chose to maintain that defense, plaintiff was properly permitted to rebut it by showing evidence of the jobs she applied for and did not get, which evidence would otherwise have been irrelevant and inadmissible. Although the government, in retrospect, may regret its strategy in asserting that plaintiff failed to mitigate her damages, it cannot fault the court for it. If USPS was "placed in an impossible situation," (Dk. 162 p. 15), it was because it placed itself there.

Additionally, the bulk of the testimony about subsequent post office positions that

plaintiff applied for but did not receive which counsel now finds objectionable has not been shown to have been prejudicial. Such testimony, as specified by the USPS at pages 13–14 of its brief (Dk.162), relates primarily to the issue of sex discrimination, not retaliation. Because the jury found in the government's favor on the issue of sex discrimination, the government can show no prejudice, and has no grounds upon which to complain.

Further, the court gave a limiting instruction to the jury on this very issue. Aware that the USPS would contend that plaintiff failed to mitigate her damages, and having anticipated that this issue would arise, the court prepared and instructed the jury when this issue first arose as follows:

During the course of this trial you may hear evidence that after her termination as a casual carrier at the Smith Center post office, plaintiff applied for and did not receive positions with the Stockton, Osborne, or other post offices. Your task is not to decide whether the post office acted legally or illegally in any acts or failures to act at any location other than Smith Center. Your sole task is to determine whether the post office acted legally or illegally in failing to rehire plaintiff at the Smith Center post office.

You may consider evidence that plaintiff applied for and did not receive positions at post offices other than the Smith Center post office, only for limited purposes. Those purposes are:

1) to determine whether plaintiff mitigated her damages;

2) to determine whether the USPS intended to discriminate against the plaintiff based upon her sex in failing to rehire her at Smith Center; and

3) to determine whether USPS intentionally retaliated against the plaintiff in failing to rehire her at Smith Center.

(R. p. 733–74).

The court presumes that the jury followed this instruction. *See United States v. Carter*, 973 F.2d 1509, 1513 (10th Cir. 1992) ("We presume jurors will remain true to their oath and conscientiously follow the trial court's instructions."), *cert. denied*, 507 U.S. 922, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993). Here, this presumption is bolstered by the fact that the jury rejected plaintiff's sex discrimination claim, the claim to which the allegedly prejudicial evidence was most relevant.

█ USPS next complains that plaintiff referred 13 times to having been "blacklisted" or "blackballed." Plaintiff's reference was to a postemployment evaluation written by Niblack (Def.Exh.D–5) which allegedly caused plaintiff not to be hired by the USPS at numerous locations other than Smith Center, and evidenced Niblack's intent in not rehiring plaintiff at Smith Center. When defense counsel on one occasion lodged an objection to plaintiff's use of this term, this court overruled the objection, stating that the term reflected only plaintiff's opinion. (R. p. 357). This ruling has not been shown to be error.

█ Further, defense counsel did not choose to object to the vast majority of those references at trial, and the court does not recall that counsel requested or received a continuing objection to plaintiff's use of such terms. "A contemporaneous objection must be made when evidence is offered at trial in order to preserve for appeal the issue of admissibility, for only by timely objection can the trial court avoid error." *Hinds v. General Motors Corp.*, 988 F.2d 1039, 1046 (10th Cir.1993)

(*citing McEwen v. City of Norman, Oklahoma,* 926 F.2d 1539, 1544 (10th Cir.1991)).

Counsel attempts to excuse his failure to object to this and other evidence by alleging that he had to choose between "allowing the opposing party to present improper evidence and accentuating the importance of the improper evidence by making yet another objection, or provoking sympathy for the opposing party." (Dk.162, p. 12). This is a common dilemma, and one counsel surely anticipated. Counsel's decision not to object deprived plaintiff of the opportunity to respond and the court of the opportunity to undertake further inquiry.

Moreover, admission of the challenged testimony did not materially affect the fairness, integrity or public reputation of the judicial proceedings, as the terms merely indicated plaintiff's characterization of Niblack's evaluation, which was admitted as an exhibit and which the jurors were free to examine for themselves.[3]

Counsel has not shown that plaintiff's use of either term is inherently prejudicial. In light of the instructions given the jury, which carefully tailored the elements of the retaliation claim to include only the events at Smith Center, and the verdict form, which did the same, no actual prejudice can be shown by plaintiff's reference to having been blackballed or blacklisted by USPS.

■ USPS next alleges unfair prejudice by virtue of plaintiff's repeated reference to her EEO activity. USPS states that because plaintiff's EEO activity on Sept. 13th was undisputed, plaintiff should not have been permitted to introduce evidence on that issue. No authority is cited for that position, however. Although the parties did stipulate to certain facts, this was not one of them. Because it remained plaintiff's burden to prove that she engaged in protected conduct, USPS's position is without merit.

The court instructed the parties, in ruling on various in limine motions and exhibits, that the sole EEO activity relevant to plaintiff's claims occurred on or about Sept. 13, 1993. Thereafter, USPS's counsel made the tactical decision to offer exhibits which contained reference to EEO proceedings and a copy of an EEO administrative decision dated May, 1996, (Exhs. D–19 and D–23) (R. p. 529, 597–98). USPS's choice to introduce these exhibits opened the door to a broad line of testimony about plaintiff's EEO activity that otherwise would have been barred, in accordance with the court's previous careful rulings. (R. p. 604–05). To the extent the admission of either of these exhibits or any testimony flowing therefrom was error, it was error invited by the defendant.

■ USPS next complains of evidence of the parties' financial conditions, objecting to plaintiff's theme that she was a "righteous individual of modest means against a powerful and unscrupulous adversary." (Dk.162, p. 21). The court has considered the Second Circuit case cited by the USPS, *Koufakis v. Carvel,* 425 F.2d 892 (2d Cir.1910) (holding that remarks that USPS should respond in damages because he is rich and the plaintiff is poor are grounds for a new trial), but does not find that the evidence of financial condition in this case approaches that in *Koufakis,* either in frequency or in kind, and does not find *Koufakis* controlling. Further, none of the evidence of financial condition which the USPS now complains about was objected to at trial.

■ USPS additionally complains of plaintiff's improper opening and closing ar-

---

**3.** To say that Exh. D–5 reflects Niblack's blackballing or blacklisting of the plaintiff is not unreasonable, based upon the evidence in this case.

guments. The bulk of USPS's complaints in this regard relate to issues the court has fully addressed above, *i.e.*, plaintiff's references to EEO matters, to other positions not received with the Postal Service, or to having been blackballed or blacklisted. The court will add that the jury was not only instructed that the arguments are not evidence, but was also instructed as to what matters could properly be considered as evidence.

The court further notes that USPS's counsel did not lodge any objections at trial to plaintiff's closing argument, or ask the court to strike either portion of plaintiff's opening statement to which he did lodge an objection. The two objections stated by USPS's counsel during plaintiff's opening appear to have been made more to prevent plaintiff from venturing further into an area defense counsel believed would become objectionable, rather than to object to statements already made by the plaintiff. (See Rec. p. 20–21, 29–30). Neither comment objected to by defense counsel during plaintiff's opening statement was prejudicial to defendant.

The court has balanced the alleged errors against the record as a whole and evaluated the fairness of the trial. None of the issues, individually or collectively, entitle the USPS to a new trial. Viewing the evidence in the light most favorable to the plaintiff, the court finds that the verdict is not clearly, decidedly, or overwhelmingly against the weight of the evidence and that sufficient evidence supports the jury's finding in favor of the plaintiff on her retaliation claim.

Trials in which a litigant is acting *pro se* pose unique and repeated challenges to all involved. Nonetheless, this is not the first time that this court has tried a discrimination case in which a plaintiff has represented herself. The court did everything possible in this case in its efforts to conduct a fair trial and to be courteous, helpful, pa-

tient and understanding to the pro se plaintiff's presentation of her case and to the government's defense thereof. The court remains fully convinced that under the circumstances presented, the case was fairly tried as to both parties. USPS's renewed motion for judgment as a matter of law, or in the alternative for a new trial shall therefore be denied.

**Remittitur**

USPS seeks remittitur, alleging that the jury's award of $80,000 as compensatory damages is excessive and should be reduced.

■ The jury " 'is clothed with a wide latitude and discretion in fixing damages pursuant to the court's instructions, deemed proper to fairly compensate the injured party.' " *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1559 (10th Cir.1991) (*quoting Bennett v. Longacre*, 774 F.2d 1024, 1028 (10th Cir.1985)), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992). The court reviews the amount of damages awarded by the jury under the standards set forth in *Malandris v. Merrill Lynch, Pierce, Fenner & Smith*, 703 F.2d 1152 (10th Cir.1981) (*en banc*) (*plurality opinion*), *cert. denied*, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983):

> [A]bsent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate. Such bias, prejudice or passion can be inferred from excessiveness. However, a verdict will not be set aside on this basis unless it is so plainly excessive as to suggest that it was the product of such passion or prejudice on the part of the jury.

*Id.* at 1168 (citations and footnote omitted).

■ Where the amount of a jury's damages award is "so excessive as to

shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial," the court must order a new trial. *Palmer v. City of Monticello,* 31 F.3d 1499, 1508 (10th Cir.1994). In such a case, a new trial is necessary because the improper cause may have invaded the liability determinations as well as the damage calculations. A verdict, however, that is excessive but is not the result of passion, prejudice, or another improper cause does not necessitate a new trial. *Mason,* 948 F.2d at 1560.

When the jury errs only as to its assessment of damages, the court may order a complete new trial, order a new trial limited to the issue of damages, or condition the denial of a new trial on the plaintiff's acceptance of a remittitur. *Id.* Finally, the court notes that "general damages for pain and suffering ... are not susceptible to proof by a set dollar amount." *Blanke v. Alexander,* 152 F.3d 1224, 1237 (10th Cir.1998).

USPS argues the award is excessive because "plaintiff's evidence of pain, suffering and emotional distress was very generic." (Dk.162, p. 24). USPS alleges that most of plaintiff's damage testimony related to her continuing efforts to get a job with USPS after September of 1993, that the amount of the award shows the jury's intent to punish USPS, and that no evidence supports the jury's award.

Plaintiff testified not only to her continuing job search after September of 1993, but also to the emotional impact upon her because of the retaliation she suffered at Smith Center. The verdict sets the amount reasonable persons estimated to be fair compensation for the injuries plaintiff suffered by virtue of the prohibited retaliation against her at Smith Center. No other standard by which to measure damages awards for pain and suffering exists. The amount awarded by the jury

by no means "shocks the judicial conscience." The court sees no justification for finding such an award to have been the product of passion or prejudice, nor does the court find the award excessive in relation to the evidence presented at trial. Accordingly, the court will not reduce the jury's determination via remittitur.

### Plaintiff's Motion

Plaintiff has moved the court to deny USPS's supplement to its memorandum in support of USPS's renewed motion for judgment as a matter of law, or in the alternative for a new trial, or remittance of the compensatory damage award (Dk.172). USPS's supplement, at which plaintiff's motion is targeted, sought only to add pages from the transcript of the trial, which pages were referenced in but not attached to USPS's original memorandum. Plaintiff objects that USPS's supplement (Dk.165) was filed after the deadline established by the court, was filed without leave of court, and has created an added burden on plaintiff, causing her to travel to Topeka three times to do research and try to obtain copies of the transcript to verify the validity of statements made in USPS's briefs.

Plaintiff is correct that USPS's supplement was filed three days late. Although it would have been preferable for USPS to have attached the referenced pages to its original memorandum, its oversight in so doing has worked no substantial prejudice to the plaintiff, as she would have had to travel to Topeka and do research and obtain copies of the transcript even had USPS properly and timely attached the transcript pages. Because attaching pages from a trial transcript to a memorandum is done primarily for the convenience of the court, not of the parties, plaintiff's motion will be denied.

Judgment shall therefore be entered in favor of USPS on plaintiff's claim of sex

discrimination, and in favor of the plaintiff on her claim of retaliation.

IT IS THEREFORE ORDERED THAT defendant's renewed motion for judgment as a matter of law, or in the alternative for a new trial, or remittance of the compensatory damage award (Dk.161) is denied.

IT IS FURTHER ORDERED THAT plaintiff's motion to deny defendant's supplement to its memorandum in support of defendant's renewed motion for judgment as a matter of law, or in the alternative for a new trial, or remittance of the compensatory damage award (Dk.172), is denied.